HOLLADAY (HELLMAN v.). See Case No. 6,340.

HOLLADAY (SAMUEL v.). See Case No. 12,288.

## Case No. 6,603.

### In re HOLLAND.

[2 Hask. 90.] [1]

District Court, D. Maine. Sept., 1876.

MORTGAGES—USUAL COURSE OF BUSINESS—FRAUD—INSOLVENCY—EVIDENCE.

1. A mortgage of a mill covers machinery afterwards purchased and put into the mill.

2. A mortgage to secure prior advances is not in the usual course of business, and in bankruptcy, is prima facie fraudulent and evidence of an intended fraud.

3. Insolvency is the inability to pay debts in the usual course of business.

4. A mortgage, of present and future stock by an insolvent, to secure promised future advances, is not in the usual course of business and is prima facie fraudulent, and cogent evidence of a design to delay, defraud and hinder creditors; and when so given, it is an act of bankruptcy under section 504, Rev. St., even though it be a valid security.

Petition by creditors to have their debtor [Thomas A. Holland] adjudged a bankrupt for giving fraudulent preferences and making conveyances of his property with

---

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

---

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

intent to delay, defraud and hinder his creditors. The debtor, by answer, averred that the conveyances given by him were given in good faith, to raise money with which to increase and prosecute his business, and without fraudulent design or purpose. Proofs were taken.

Byron D. Verrill, for petitioners.
John O. Winship, for respondent.

FOX, District Judge. The requisite number of creditors having become parties to this petition, and a trial by jury having been waived, the question for my determination is, whether the alleged acts of bankruptcy are established. The respondent is the only witness, and is called by the petitioners. His business has been that of manufacturing blankets at Windham in this district. He is charged with having in violation of the bankrupt act [of 1867 (14 Stat. 517)] made two mortgages to Swett & Leavitt, one April 12, 1876, the other May 4th, the same year. The first mortgage covered "all the tools and machinery in his woolen mill at Mallison Falls, on the Presumpscot river in Windham, and the water wheel and all stock manufactured and in process of manufacture," and was to secure the payment to the mortgagees of his note for $10,000 in three months with interest at ten per cent. The second mortgage was to the same parties to secure the payment of Holland's two notes, each for $5,000, payable in thirty and sixty days from May 4th with interest at twelve per cent., and included all the woolen and shoddy stock, also oils and dye stuffs and fittings contained in the woolen mill situated at Mallison Falls, and all stock in any outbuilding in said Windham and Gorham belonging to him; "also all woolen stock which may be purchased by me and stored in said mill and outbuildings to be there manufactured, unmanufactured and in process of manufacture." These mortgages were duly recorded. Both of them are charged to have been made with an intent to give the mortgagees a preference, and also with a purpose and design on the part of Holland to delay, defraud, and hinder his creditors. It appears that in the fall of 1874, Holland purchased the mill and power at Mallison Falls for $12,200, paying but $500, and securing the balance by mortgage of the property, on which but $200 has since been paid by him. He repaired the dam, sold some of the old machinery and substituted new at an expense, as he says, of from $2,000 to $3,000. Under the decisions in this state, this machinery became a part of the realty, and is held by the mortgage now in process of foreclosure. The rights of Swett & Leavitt are not involved in the question I am now to determine, and I have purposely refrained from allowing my mind to arrive at any conclusion upon them; neither is it requisite that I should decide whether I can depend on the statement of Holland that $8,000 was stolen from him on the 4th of July. The single question here at issue is the purpose and object of Holland in making these conveyances. The mortgages may be perfectly valid security to the mortgagees, and yet the mortgagor may, by their execution, have subjected himself to the liability of being adjudged a bankrupt. Section 5021, Rev. St., declares that any person "who makes any assignment, gift, sale, conveyance or transfer of his estate, etc., with intent to delay, defraud, or hinder his creditors, shall be deemed to have committed an act of bankruptcy, and to have become liable to be adjudged a bankrupt."

Holland, in answer to his counsel, swears that, in making these mortgages, he had no such purpose or intent; that his object was to sustain his credit, so as to make large purchases of material to manufacture, as he was advised that in all probability they were then at the lowest rate and would undoubtedly advance, and if so, the goods manufactured would also advance, and he would thereby derive a large profit in his business; and that to carry out this purpose, it was necessary to obtain large credit; and to meet his liabilities and to accomplish his purpose, he effected the mortgage of May 4th. It is with regret that I am compelled to the conclusion that such was not the object and design of Holland in giving this mortgage. This mortgage, as well as the previous one of April 12th, was not in the regular course of his business, and they were, therefore, prima facie fraudulent, as is expressly declared by the bankrupt act. Holland denies that he was insolvent on the 4th of May. I have but little doubt that he was in that condition in January; and I am satisfied that he was constantly falling behind hand, until he found himself owing more than $20,000, and with little or no assets to meet it. It is now demonstrated that in May he was utterly insolvent; and from the condition of the business in which he was employed, and the failure of his consignees to make sales of his goods, I think he could not but conclude and believe that he was then unable to pay all that he owed. He substantially admits that, at the time he executed certain bills of sale in February, to secure loans included in the first mortgage, he was then insolvent within the meaning of the bankrupt law, as he says, he could not then have met his liabilities, unless he had raised these sums by means of these conveyances, two of which were of stock purchased by him on credit, and conveyed by him before it had come to his possession and while in transit on the cars, to raise money to pay his old liabilities, a circumstance, that the court cannot but remark is strongly indicative of a fraudulent design. Whenever a party is found purchasing goods on credit, and, before he has received them into his possession, conveying

them in this manner to raise money to pay old debts, his conduct is so openly and clearly fraudulent, and manifests such fraudulent purpose on the part of the vendor, that a court would be fully justified in finding that he intended to accomplish a fraud by such proceedings, without further evidence; and it is most conclusive evidence that Holland's pecuniary condition was such that he could not fairly and honestly meet his liabilities as they fell due.

Confining my attention to the mortgage of May 4th, I am clearly of opinion that instead of sustaining his credit thereby, this conveyance, when it should become known to his creditors, would have an effect directly the contrary. As I have had occasion repeatedly to remark in cases of this nature, nothing is so surely fatal to a debtor's credit, as a heavy mortgage encumbering his stock. No one will even resort to such a device to continue his business, unless compelled so to do by pressing necessities; and creditors who may receive the money realized by the mortgage, at once become distrustful, and will no longer afford credit to the party, as they will understand his situation, and that no security remains in the debtor's hands for the payment of his future indebtments; and more especially is such the case, when there is found contained in the conveyance a provision, such as is met with in the mortgage of May the 4th, including "all the stock which I may afterwards purchase." If a seller was aware of such a clause, and understood that the goods he was about to dispose of were, the moment the sale was completed, to pass beyond the control of the purchaser without payment therefor, it cannot be believed that any one could be found who would be willing to sell his goods on credit under such circumstances; on the other hand, if Holland was willing and ready thus to buy goods on credit, which the mortgagees by such a conveyance would acquire a title to and hold as security for prior advances, it is to my mind cogent proof of a wicked, fraudulent purpose on his part, which should subject him to be adjudged a bankrupt. According to Holland's statement, there was on the 4th of May due to him from Swett & Leavitt $2,000 on the prior mortgage; this had been due to him ever since the giving of the mortgage April 12th, and still remains unpaid. If Holland on the 4th of May was in need of money to meet his liabilities, why did he not call upon the mortgagees for this sum, and apply it to the most pressing claims against him, instead of giving them a new mortgage for $10,000, from which not a dollar was received by him, as he admits, until after the first note of $5.000 secured thereby had become due and payable? Why should he then encumber his property for this large amount, giving security payable in thirty and sixty days for further ad-

vances, when there was still this balance of $2,000 due and unpaid? Such conduct, to my mind, speaks louder and more clearly as to his purpose, than any explanation which he may now give as a witness. By this mortgage, he was on May 4th encumbering his stock for its full value, apparently holding forth to his creditors that he was the debtor of Swett & Leavitt for this amount, that they had advanced him the $10,000 and were entitled to this security therefor, when in fact, on that day, he was not the debtor of Swett & Leavitt for a single dollar for this mortgage, but they were indebted to him $2,000 on the prior mortgage. There was falsehood and deception practiced by the very instrument now under consideration; and this continued from day to day until a moiety of the mortgage debt had become due and payable. Was not his object, by this conveyance, to misrepresent the condition of his affairs, to deceive and defraud his creditors, and prevent their resorting to this property for the payment of their claims against him? Such certainly was the result which one would ordinarily anticipate from such conduct, and the court cannot but believe such was his purpose and object. Upon the face of the mortgage it bore an absolute lie, daily repeated for a month, by declaring that Holland was indebted to Swett & Leavitt for the sum of $10,000, when, as is shown, nothing was due to them thereon.

As evidence, not without weight, is the further fact that Swett & Leavitt never gave to Holland any note or memorandum to manifest their liability to him for this large amount. The payment by them to him of this large sum was left wholly dependent on the memory of the parties, while the rights of Swett & Leavitt were protected by the most formal instrument. Holland's dealings after May 4th with some of his creditors throw much light on his intentions; but without commenting further on the testimony in this case, I am, by the facts and circumstances in evidence before me, notwithstanding the positive evidence of Holland to the contrary, forced to believe that his purpose and design in executing the mortgage of May 4th, was to hinder, delay and defeat his creditors; and I am therefore compelled to adjudge him a bankrupt for so doing.